# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 1:24MJ74-1 |
| Information associated with btaxservice650@gmail.com that is stored at the premises controlled by Google LLC | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1344 371, 1957 | Wire fraud; bank fraud; conspiracy; and engaging in monetary transactions in property derived from specific unlawful activity |

The application is based on these facts:
See affidavit of Special Agent Brett Barton

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Brett Barton
*Applicant's signature*

Brett Barton, Special Agent IRS-CI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: _____02/15/2024_____

_____
*Judge's signature*

City and state: Durham, North Carolina

Joe L. Webster, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH BENNETTABABIO@YAHOO.COM THAT IS STORED AT PREMISES CONTROLLED BY YAHOO, INC AND<br><br>INFORMATION ASSOCIATED WITH BTAXSERVICE650@GMAIL.COM THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 1:24MJ74-1 |

**AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR SEARCH WARRANT**

I, Brett Barton, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with the email account bennettababio@yahoo.com ("SUBJECT EMAIL ACCOUNT #1") and btaxservice650@gmail.com ("SUBJECT EMAIL ACCOUNT #2," and collectively, the "SUBJECT EMAIL ACCOUNTS").

2.     The information associated with the SUBJECT EMAIL ACCOUNTS are stored at premises controlled by the following companies:

     a.  <u>SUBJECT EMAIL ACCOUNT #1</u> – Yahoo, Inc., an email provider

        headquartered at 391 San Antonio Rd., Mountain View, CA 94040.

     b.  <u>SUBJECT EMAIL ACCOUNT #2</u> – Google LLC, an email provider

        headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043

1

3. The information to be searched is described in the following paragraphs and in Attachments A-1 through A-2 (collectively, "Attachments A"). This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google LLC and Yahoo, Inc. to disclose to the government copies of the information to be searched and seized (including the content of communications) further described in Section I of Attachments B-1 through B-2 (collectively, "Attachments B"). Upon receipt of the information described in Section I of Attachments B, government-authorized persons will review that information to locate the items described in Section II of the Attachments B.

4. I have been a special agent with the Internal Revenue Service, Criminal Investigation since July 2020. I am a graduate of Southern Wesleyan University with a bachelor's degree in accounting and business administration, and a graduate of Clemson University with a Master of Professional Accountancy degree with a concentration in assurance services. I have been a Certified Public Accountant in the state of South Carolina since January 2013. I am a graduate of the Criminal Investigator Training Program and the Special Agent Investigative Techniques program at the Federal Law Enforcement Training Center at Glynco, Georgia. Previously, I was employed as a Special Agent with the South Carolina Department of Revenue Criminal Investigation, as well as a Special Agent with the Naval Criminal Investigative Service (NCIS). I have had extensive training in financial investigations which included the developing probable cause for search warrants, analyzing financial documents, and interviewing witnesses.

5. The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained from other individuals involved in this investigation, including interviews of a co-conspirator, review of documents and records related to this investigation, and information gained

2

through my training and experience. The information provided in this affidavit is supported by my training, experience, education, and participation in this and other financial investigations.

6.    Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of the investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (Bank Fraud), and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specific unlawful activity), among others, (collectively the "SUBJECT OFFENSES") have been committed by BENNETT ABABIO (ABABIO) and others. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachments B.

## JURISDICTION

7.    This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§2703(a), (b)(1)(a), and (c)(1)(a). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offenses being investigated." 18 U.S.C. § 2711(3)(a)(i).

## Background on CARES Act Relief

8.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 27, 2020 that was designed to provide emergency financial assistance to Americans who were suffering negative economic effects caused by the COVID-19 pandemic. One of the core provisions of the CARES Act was the authorization the Paycheck Protection Program ("PPP") which authorized the U.S. Treasury to use the Small Business Administration ("SBA") loan program to issue $349 billion in potentially forgivable loans to small businesses

3

for job retention and certain other expenses. Additional PPP funding was authorized in legislation enacted on or about December 27, 2020, and March 11, 2021.

9.  The Economic Injury Disaster Loan ("EIDL") program is an SBA program that provides low-interest loans and grants to qualifying small businesses for ordinary and necessary financial obligations that cannot be met as the result of a declared disaster.

10.  The CARES Act also authorized the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The advances were immediately forgivable as a grant and did not have to be repaid.

11.  In order to obtain an EIDL and advance (grant), a qualifying business had to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period preceding the disaster was that preceding January 31, 2020. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge and that he/she would submit truthful information in the future.

12.  The amount of the EIDL loan, if the application was approved, was determined based, in part, on the information provided on the application about employment, revenue, and cost of goods sold, as described above. Any funds issued under EIDL or EIDL advance were issued directly by the SBA. Permissible uses of EIDL funds, included payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

13.  To obtain a PPP loan, a qualifying business had to submit a PPP loan application,

4

which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses.

14. A PPP loan application was processed by a participating financial institution (the lender). If a PPP loan application was approved, the lender would fund the PPP loan using its own monies, which were, in turn, 100% guaranteed by Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

15. PPP loan proceeds had to be used by the business on certain permissible expenses— namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses. The PPP Loan Forgiveness Application, created by the SBA, was available from the SBA or the borrower's lender.

5

## PROBABLE CAUSE

### *Probable Cause Summary*

16.     As described in further detail below, there is probable cause to believe ABABIO engaged in a scheme to fraudulently obtain COVID-19 relief funds for his own companies and others through his company, B&G Accounting and Tax Service ("B&G Accounting"). ABABIO prepared and submitted at least 14 PPP loan applications and was listed as the preparer on 71 EIDL applications.

17.     All fourteen PPP loan applications and approvals were processed by the First National Bank of Pennsylvania (FNB). ABABIO frequently communicated with FNB regarding PPP loan applications, required PPP loan documents, and PPP loan forgiveness applications via email using the SUBJECT EMAIL ACCOUNT #1 or the FNB portal using SUBJECT EMAIL ACCOUNT #2.

18.     Based upon review of the bank accounts where the PPP funds were deposited, it did not appear the PPP loan funds were spent in the manner which was conveyed to FNB and/or the SBA via the PPP loan forgiveness documents. As an example, one of ABABIO's companies called Medical Transport Systems, LLC ("MTS") received a total of $554,555 in PPP funds. After receiving the funds, ABABIO wrote numerous checks to a single company. The memo lines on the checks had descriptions to make the checks appear to be appropriate business expenses, such as the following: business acquisition, loan payment, supplies, and independent contractor. Furthermore, a review of the bank accounts and PPP loan applications revealed the payroll figures listed on the PPP loan applications appeared inflated for purposes of qualifying for loan forgiveness.

6

### *Details of the Investigation*

19.     ABABIO prepared and submitted a PPP loan application for co-conspirator's, E.L's, business, Zioness Skin Care ("ZSC"), located in Greensboro, NC. ZSC's PPP loan application contained a fraudulent average monthly payroll amount of $126,852. This payroll figure was determined to be false based on an interview of E.L., as well as review E.L.'s bank records. As a result of the fraudulent application, FNB disbursed a $317,130 PPP loan to ZSC.

20.     E.L. explained in an interview with special agents from Internal Revenue Service – Criminal Investigation ("IRS-CI") that ABABIO contacted her to see if she was interested in filing a PPP loan application for ZSC. E.L. agreed to allow ABABIO to complete an application on her behalf, and on June 1, 2020, ABABIO submitted a fraudulent PPP loan application for ZSC and included a false Form 1120, U.S. Corporation Income Tax Return (Form 1120) as part of the supporting documents. E.L. noted in her interview that the tax return was false, and she did not provide the information found on the tax return to ABABIO. ABABIO filed this fraudulent Form 1120 with the IRS on June 6, 2020, from B&G Accounting, his wholly owned business, and listed his name and SUBJECT EMAIL ACCOUNT #1 in the paid preparer section. On February 8, 2021, at 1:39 p.m., ABABIO sent E.L. the same fraudulent Form 1120 filed with the IRS to E.L. from SUBJECT EMAIL ACCOUNT #1 (See Image #1). The following email, reproduced in Image 1 below, was obtained from E.L.

**Image 1**



**Fwd: 2019 tax returns**
1 message

Z█████S███b <z█████s██c█@gmail.com>                    Mon, Mar 8, 2021 at 6:53 PM
To: el███████@gmail.com

---------- Forwarded message ----------
From: Bennett Ababio <bennettababio@yahoo.com>
Date: Mon, Feb 8, 2021 at 1:39 PM
Subject: 2019 tax returns
To: Z█████S██c <z█████s██c█@gmail.com>

📄 2019 Tax Return Documents (Z█████S█C█████1.pdf
   115K

    21.     When E.L. received the PPP loan proceeds, ABABIO came to Greensboro, NC to pick up checks from E.L. for fees associated with the PPP loan. ABABIO had E.L. write four checks, leaving the "To" field blank. Upon reviewing cleared checks numbered, 0991, 0992, 0993, and 0994, E.L. noted the "To" field bearing B&G Accounting, was not her handwriting. Check 0991 was for $47,570 bearing a memo of "Payroll Tax," check number 0992 was for $2,962 bearing a memo of "Corporate Tax," check number 0993 was for $60,958 bearing a memo of "Payroll Tax 2019," and check number 0994 was for $2,500 bearing a memo of "Accounting Expenses." E.L. believed ABABIO was going to send some of these checks to the government to pay taxes for the payroll that was claimed on the PPP application. Based upon review of B&G Accounting's bank records at Truist Bank, formerly known as SunTrust Bank, it did not appear ABABIO made payments to the IRS and instead used it for his own purposes.

    22.     E.L. also explained that ABABIO prepared payroll checks for ZSC so the PPP loan would qualify for forgiveness, even though ZSC did not have a formalized payroll system before

or after the payroll checks provided by ABABIO. E.L. told investigators that before ZSC received the PPP loan, E.L. was the only employee and only paid her two children a maximum of $1,000 each for the entire year. Upon receiving the PPP loan, ABABIO told E.L. that 60%-70% of the PPP loan proceeds needed to be used for payroll to qualify the PPP loan for forgiveness. ABABIO provided E.L. with pre-printed, sequentially numbered payroll checks for E.L.'s employees/family to make it appear as though E.L. had payroll for her business.

23.     According to E.L., the payroll checks were only made by ABABIO to qualify the PPP loan for forgiveness. E.L. distributed payroll checks totaling $125,236 to herself, her husband, and her two children for purposes of qualifying the loan for forgiveness. There was a specific pattern which the sequential payroll checks were written, which does not follow common practice for the processing of payroll. An example would be employee #1 received payroll checks numbered one through five related to payroll for five concurrent pay periods, and employee #2 received payroll check numbers six through ten for the same pay periods. Standard practice would be for employee #1 to receive paycheck number one and employee #2 to receive paycheck number two, both for the same pay period.

24.     On November 11, 2022, ABABIO submitted a PPP loan forgiveness application to FNB for ZSC which fraudulently reported that ZSC paid $262,900 in payroll expenses for eight employees for the period of June 2020 through November 2020.

25.     ABABIO submitted E.L.'s PPP loan forgiveness application and supporting documents to FNB via FNB portal and email. The FNB portal for E.L.'s PPP loan had SUBJECT EMAIL ACCOUNT #2 listed as the email, noting the email was confirmed March 1, 2021 at 12:33:06 p.m. The last successful log-in to this portal was on November 21, 2022. The last login

coincides with ZSC's PPP loan forgiveness application showing a signed date of November 21, 2022 at 13:19:58.

26.     Per FNB, the portal was used to communicate with the customer applying for the PPP loan. The customer would receive a link, via the email used to sign up for the portal, to log into the portal to review messages from FNB. The portal was also way for customers to apply for forgiveness of the PPP loans, as well as provide any additional documents requested by the SBA. The portal was the main way to provide documents regarding the PPP loan to FNB. FNB noted customers could also communicate directly with FNB as discussed and shown in images later, or via manual submission at an FNB branch. The email used to sign up for the FNB portal received emails regarding when the customer applied for the PPP loan, as well as decisions made by the SBA regarding the PPP loan.

27.     ABABIO also submitted a second PPP loan application for ZSC on March 1, 2021, listing the average monthly payroll as $61,260 and annual gross receipts for 2020 as $309,456. The number of employees listed on the application was twelve. E.L. told investigators that both the payroll and gross receipts figures were fraudulent. The digital signature on the application bears the name of E.L., but the FNB portal was the same used to submit documents for the first PPP loan which used SUBJECT EMAIL ACCOUNT #2 to register for the portal account as noted above. Furthermore, ABABIO used SUBJECT EMAIL ACCOUNT #1 to communicate with FNB regarding a copy of the second PPP loan application so he could make adjustments to the application. The following email, reproduced in Image 2 below, was obtained from FNB. ZSC's second PPP loan request was not funded.

10

From: Bennett Ababio <bennettababio@yahoo.com>
Sent: Thursday, March 25, 2021 3:15 PM
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮@fnb-corp.com>
Subject: hard copy of application

**WARNING - External email; exercise caution when opening attachments or clicking any links.**

Jamar, can you please send the hard copies of the following companies;

    a. Golden xcape

    b. zioness

    c. Benrosa

    d. benric
I need these hard copy to make the necessary changes on the application. Thank you

bennett

28.    A review of the other PPP applications prepared by ABABIO and corresponding bank records revealed that at least seven businesses followed the same pattern of sequentially issued payroll, indicating the payroll for those companies was manufactured for purposes of qualifying the PPP loan for forgiveness.

### *ABABIO's PPP and EIDL Loans*

29.    ABABIO appears to own, or partially own, five companies as follows: (a) Benrosa Trading Company, LLC (BTC); (b) MTS; (c) B&G Accounting; (d) Vision Investment Group, LLC (VIG); and (e) Benric Title Loans Services, LLC (BTL). ABABIO's five companies received two PPP loans each from FNB, totaling $2,581,833. All of the PPP loans for ABABIO's companies received forgiveness.

11

30.     As explained, FNB used a portal for the applicant to upload and sign PPP related documents. Per records received from FNB, BTC, MTS, and VIG registered for the FNB portal account using SUBJECT EMAIL ACCOUNT #1, and B&G Accounting and BTL used SUBJECT EMAIL ACCOUNT #2. A valid email was required to access the FNB portal. All portal accounts show the email was confirmed in January or February of 2021. The last successful login for these accounts shows June, August, and October of 2022. These dates were taken from item provided by FNB.

31.     IRS-CI reviewed MTS's PPP loan applications, supporting documents, and bank records for the account where the PPP money was received. That analysis showed that the PPP funds were not spent on payroll or other approved expenditures. Specifically, during 2020 and 2021, MTS received a total of $554,555 in PPP loan funds. However, only 19 payroll checks were drawn against the PPP loan account for a total of $25,424. Moreover, four of the five individuals who received payroll checks received sequentially numbered checks in the same fashion described in paragraph 23. In contrast, the employee summary and forgiveness documentation provided to FNB with the forgiveness application showed total payroll from June 8 to November 22, 2020 to be $213,712. The employee summary provided to FNB appears to be a payroll summary for a specified date range. The employee summary for MTS contradicts the payroll that came out of the PPP loan account, which was much less, as noted above.

32.     During 2020 and 2021, MTS sent $294,130, i.e., 53% of MTS's total PPP funds, to a single company named Feoga Ventures, LLC (Feoga). These checks bore the following memos: Independent Contractor, Vendor (Supplies), Contract Charges, Independent Contractor, Business Acquisition, Payment of Debt. The owner of Feoga, G.O., was interviewed regarding these transactions. G.O. stated Feoga was a chicken wholesaler who purchased chicken from a supplier

12

who then shipped the chicken directly to his overseas buyer. G.O. could not explain why the above memos were written on checks he received from MTS, and simply said he only buys and ships chicken. The PPP loan forgiveness documents showed the majority of the PPP loan proceeds funding payroll. Upon inspection of the PPP loan account, the above expenditures appear to be contradictory to what was provided to FNB to qualify the PPP loans for forgiveness. It is not apparent at this time why a medical transport business located in Maryland would be purchasing chicken from a wholesaler who ships product overseas.

33.    IRS-CI reviewed PPP loan applications, supporting documents, and bank records associated with ABABIO's other PPP loans which totaled $2,027,278. Based on this review, it appears ABABIO fraudulently provided payroll summary reports showing payroll totals which would qualify the PPP loans for forgiveness. The undersigned reviewed the bank accounts where the PPP funds were received. A review of those records revealed that ABABIO did not make the payroll payments he listed on the summary reports and forgiveness applications.

34.    ABABIO communicated with FNB about MTS's PPP loans using SUBJECT EMAIL ACCOUNT #1 as shown in Image 3 below. Per review the email and of the attachments seen in Image 3, FNB appears to ask ABABIO about inconsistencies in his applications and supporting documentation for loans and forgiveness.

**Image 3**

| From: | |
|---|---|
| To: | Bennett Ababio |
| Subject: | MTS |
| mailto:bennettababio@yahoo.com June 22, 2021 11:08:00 AM | |
| Attachments: | MTS 2019 TAX RETURN.pdf |
| | MTS SIGNED PNL.pdf |

Hey Bennett,

So MTS showed $7300 in net income on their 2019 tax return. The 2020 PnL for MTS shows over $400,000 of net income. Do you know what the final number will be?

Regards,

**Vice President**
**Business Development Officer II**
**First National Bank**

| Office: | |
|---|---|
| Cell: | |
| Fax: | |
| | @fnb-corp.com |

    35.    Emails to and from FNB officials relate to ABABIO's businesses, BTC, MTS, B&G Accounting, VIG, and BTL regarding PPP loans. Items provided by ABABIO range from PNL statements, copies of tax returns, updated PPP loan applications, and updates on the progress of the loans or the forgiveness of the loans, to name a few. There is probable cause to believe that ABABIO secured loans for his companies using false documentation and misrepresentations and subsequently secured forgiveness of the loans with additional false documentation and misrepresentations. The following emails, reproduced in Image 4 and Image 5 below, were obtained from FNB and are examples of the communication regarding ABABIO's PPP loans.

14

**Image 4**

| From: | ▆▆▆▆ |
|---|---|
| To: | Bennett Ababio |
| Subject: | PPP PnL's |
| mailto:bennettababio@yahoo.com | Thursday, January 28, 2021 3:53:00 PM |
| Attachments: | BG PPP PNL.pdf |

Hey Bennett,

Please sign and date "each page" of all your PnL's and send them back to me as soon as possible

Regards,

▆▆▆▆▆▆

**Vice President**
**Business Development Officer II**
**First National Bank**

▆▆▆▆▆▆▆

Office: ▆▆▆▆▆▆
Cell: ▆▆▆▆▆▆
Fax: ▆▆▆▆▆▆

▆▆▆▆▆ @fnb-corp.com

**Image 5**

| From: | Bennett Ababio |
|---|---|
| To: | ▆▆ |
| mailto:bennettababio@yahoo.com | BENRIC TITLE LOANS REQUESTED INFORMATION |
| Date: | Tuesday, April 13, 2021 6:37:53 PM |
| Attachments: | benric loan.pdf |
| | PPPMaxEligibleAmountCalculator2021BENRIC.xlsx |
| | benric payroll (2).pdf |
| | benric 941 (2).pdf |

**WARNING - External email; exercise caution when opening attachments or clicking any links.**

36.     B&G Accounting also applied for EIDL loans. B&G Accounting's EIDL intake form listed SUBJECT EMAIL ACCOUNT #2 as the business email. SBA documentation pertaining to the B&G Accounting's EIDL file shows ABABIO as the primary contact and lists email as SUBJECT EMAIL ACCOUNT #1. The affiant has been informed the EIDL application process is conducted online, and the primary contact point for the loan applicant is the primary

15

contact e-mail address, which is entered as part of the initial application – in this case, SUBJECT EMAIL ACCOUNT #1. E-mails are sent from the SBA to this address in order to inform them of the loan process and any further steps that need to be taken by the applicant. This EIDL application listed gross revenues for B&G Accounting for the 12 months prior to January 31, 2020, as $148,765. Per review of the first PPP loan application for B&G Accounting, the average monthly payroll listed on the application was $43,860, which would have been calculated on 2019 average payroll. The IRS Form 940 for 2019 that ABABIO submitted with the B&G Accounting PPP application $526,320 for the year. The EIDL loan ABABIO applied for was not approved. Given the amount of gross income noted above of $148,765 on the EIDL application, it does not appear possible to pay wages in the amount of $526,320 per the 2019 Form 940 file with the PPP loan documents.

## BACKGROUND REGARDING EMAIL PROVIDERS SERVICES

37.     In my training and experience, I have learned that Google LLC and Yahoo, Inc. (the "EMAIL PROVIDERS") provide the public with a variety of on-line services, including electronic mail ("email") access, to the public. The EMAIL PROVIDERS allow subscribers to obtain email accounts under various domain names, including gmail.com for Google LLC, and yahoo.com for Yahoo, Inc. like the email account listed in Attachments A. Subscribers obtain an account by registering with the EMAIL PROVIDERS. During the registration process, the EMAIL PROVIDERS asks subscribers to provide basic personal information, which may include name, address, phone numbers, payment information, and other personal information. Therefore, the computers of the EMAIL PROVIDER are likely to contain stored electronic communications (including retrieved and unretrieved email for the EMAIL PROVIDERS' subscribers) and information concerning subscribers and their use of the EMAIL PROVIDERS' services, such as

16

account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

38.     In my training and experience, EMAIL PROVIDERS typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

39.     In general, an email that is sent to an EMAIL PROVIDERS' subscriber is stored in the subscriber's "mailbox" on the EMAIL PROVIDERS' servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on the EMAIL PROVIDERS' servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the EMAIL PROVIDERS' servers for a certain period of time.

40.     When subscribers send emails, they are initiated at the users' computers, transferred via the Internet to the EMAIL PROVIDERS' servers, and then transmitted to their end

17

destinations. The EMAIL PROVIDER often maintains a copy of the email sent. Unless the email senders specifically delete the emails from the EMAIL PROVIDER'S servers, the emails can remain on the systems indefinitely. Even if the senders delete the emails, they may continue to be available on the EMAIL PROVIDERS' servers for a certain period of time.

41.     A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email. If an email user writes a draft message but does not send it, that message may also be saved by the EMAIL PROVIDER but may not include all of these categories of data.

42.     Subscribers to the EMAIL PROVIDERS' services can also store files, including emails, address books, contact or buddy lists, calendar data, photographs, and other files, on servers maintained and/or owned by the EMAIL PROVIDER. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, attachments to emails, including photographs and files, and photographs and files stored in relation to the account.

43.     A subscriber to a Google Gmail account can also store files, including address books, contact lists, calendar data, photographs and other files, on servers maintained and/or owned by Google LLC. For example, Google LLC offers users a calendar service that users may utilize to organize their schedule and share events with others. Google also offers users' a service called Google Drive that may be used to store data and documents. The Google Drive service may be used to store documents including spreadsheets, written documents (such as Word or Word Perfect) and other documents that could be used to manage a website. Google Drive allows users to share their documents with others or the public depending on the settings selected by the account holder. Google LLC also provides its users with access to the photo storage service "Picasa."

18

Picasa can be used to create photo albums, store photographs, and share photographs with others. Another Google LLC service called "You Tube" allows users to view, store and share videos.

44.     Additionally, based on my training and experience, as well as Google's Privacy Policy, I know that Google LLC also collects information about users, including information about the devices on which they access their accounts, the devices' hardware models, operating system versions, unique device identifiers, and mobile network information including phone number, location information, and search queries. This information is evidence that can be used to identify and find the individuals conducting the fraud.

45.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. EMAIL PROVIDERS typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

46.     This application seeks a warrant to search all responsive records and information under the control of the EMAIL PROVIDERS, providers subject to the jurisdiction of this court, regardless of where the EMAIL PROVIDERS have chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within the EMAIL

19

PROVIDERS' possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

47.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime

20

(*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

48. Based on my training and experience, I know that some EMAIL PROVIDERS, including Google LLC, often use internet cookie files to track user information. These "cookies" may allow the email providers to collect information about the account users' computers, including information about other accounts accessed by a computer containing the email provider's "cookie." Specifically, the EMAIL PROVIDERS may collect information about other email accounts with their service that were accessed by the computers that also accessed the email accounts described in Attachments A. Information regarding other email accounts accessed from the same computer(s) that accessed the email accounts described in Attachment A may provide important evidence about the person using both accounts, including his/her identity and location, as well as the full extent of the fraud.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

49. Pursuant to Title 18, United States Code, Section 2703(g), this application and affidavit for a search warrant seeks authorization to permit the EMAIL PROVIDERS and their agents and employees, to assist agents in the execution of this warrant. Once issued, the search warrant will be presented to the EMAIL PROVIDERS with direction that they identify the relevant account(s) described in Attachment A to this affidavit, as well as other subscriber and log records associated with the account, as set forth in Section I of Attachments B of this affidavit.

50. The search warrant will direct Google LLC and Yahoo, Inc. to create an exact copy of the specified account and records.

21

51.     I, and/or other law enforcement personnel, will thereafter review the copy of the electronically stored data and identify from among that content those items that come within the items identified in Section II to Attachment B, for seizure.

52.     Based on my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize a variety of email communications, chat logs and documents, that identify any users of the subject account and emails sent or received in temporal proximity to incriminating emails that provide context to the incriminating communications.

### CONCLUSION

53.     Based on the forgoing, there is probable cause to believe the SUBJECT EMAIL ACCOUNTS were used to facilitate the TARGET OFFENSES and that evidence of the crimes will be found within the content of the SUBJECT EMAIL ACCOUNTS. I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.

54.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Because the warrant will be served on the EMAIL PROVIDERS, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the items specified in Section I, Attachments B (attached hereto and incorporated by

22

reference herein) to the Warrant, and specifically to seize all of the data, documents and records

that are identified in Section II to those same Attachments.


/s/ Brett Barton
Special Agent Brett Barton
IRS Criminal Investigation


Honorable Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

February 15, 2024    2:43 pm

23

## Attachment A-2

### Property to Be Searched

This warrant applies to information associated with the account **btaxservice650@gmail.com** that is stored at premises controlled by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

<u>**Attachment B-2**</u>

**Particular Things to be Seized**

I. **Information to be disclosed by Google LLC. (the "Provider")**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Provider, <u>regardless of whether such information is stored, held or maintained inside or outside of the United States,</u> including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f) – **Google Reference Number 41506772**, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A from March 1, 2020 to December 1, 2022, unless otherwise indicated.

    a.    The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

    b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.    The types of services utilized;

d.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.


**The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.**

## II   Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specific unlawful activity) and aiding and abetting of these offenses, including, for each account or identifier listed on Attachment A-1, information pertaining to the following matters:

    a.  Evidence revealing to the identity of the individual(s) with access to the SUBJECT ACCOUNT;

    b.  Records, information, and communications referencing the Economic Injury Disaster Loan program ("EIDL"), the Paycheck Protection Program ("PPP"), or other forms of relief provided for by the CARES Act;

    c.  Evidence of, or communications referencing the receipt or use of COVID relief funds;

    d.  Evidence of, or communications referencing forgiveness of PPP loans;

    e.  Records, information, and communications referencing Benrosa Trading Company, LLC;

    f.  Records, information, and communications referencing Medical Transport Systems, LLC;

    g.  Records, information, and communications referencing B&G Accounting;

    h.  Records, information, and communications referencing Vision Investment Group, LLC;

    i.  Records, information, and communications referencing Benric Title Loans Services, LLC; and

    j.  Records, information, and communications referencing clients of the SUBJECT who received EIDL, PPP, or other CARES Act funds.